**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAS VEGAS SANDS, LLC, a Nevada
limited liability company, DBA
Venetian Resort Hotel Casino,
            *Plaintiff-Appellee,*

            v.

AMINE T. NEHME,
            *Defendant-Appellant.*

No. 09-16740

D.C. No.
2:07-cv-01012-BES-
RJJ

OPINION

Appeal from the United States District Court
for the District of Nevada
Brian E. Sandoval, District Judge, Presiding

Argued and Submitted
June 17, 2010—San Francisco, California

Filed January 11, 2011

Before: A. Wallace Tashima and Carlos T. Bea,
Circuit Judges, and Linda R. Reade, Chief District Judge.*

Opinion by Judge Bea

*The Honorable Linda R. Reade, Chief United States District Court
Judge for the Northern District of Iowa, sitting by designation.

643

## COUNSEL

Gary Logan, Esq., Las Vegas, Nevada, for the defendant-appellant.

Von S. Heinz, Lewis and Roca LLP, Las Vegas, Nevada, for the plaintiff-appellee.

## OPINION

BEA, Circuit Judge:

This diversity action arises out of a gambling debt Amine T. Nehme ("Nehme") is claimed to owe Las Vegas Sands, LLC (the "Venetian"), on an unpaid casino "marker" in the amount of $499,000, plus interest.

A marker is a gambling credit instrument that allows a gambler to receive all or part of the credit line the casino has approved for him, based on the gambler's prior credit application with the casino. Once the gambler and a casino representative sign the marker, the gambler may exchange the marker for gambling tokens, or chips. If the gambler does not pay the marker when he has finished gambling, the marker is outstanding and the casino may later submit the marker, like a check, to the gambler's bank for payment.

On cross-motions for summary judgment, the district court excluded from evidence two key documents proferred by defendant Nehme on the ground they were not properly authenticated by an affidavit made on personal knowledge: (1) a letter from one of Nehme's attorneys that predated Nehme's unpaid marker by seven months and that requested, on Nehme's behalf, that the Venetian cancel and not renew, under any circumstances, Nehme's credit line; and (2) a U.S. Postal Service return receipt, dated three days after the letter, that recites someone at the Venetian may have received Nehme's attorney's letter before Nehme signed the marker. The district court then granted summary judgment to the Venetian on claims that Nehme had failed to pay a negotiable instrument (the marker), and had breached a contract (a prior

credit application agreement and the marker). The district court denied Nehme's motion for reconsideration, and Nehme timely appealed.

We conclude that the district court abused its discretion in excluding the above pieces of evidence under an incorrect legal standard and that this error was not harmless. Thus, we reverse and remand with instructions that the district court consider such evidence under the correct legal standard.

## Factual and Procedural Background

Nehme, a California resident, is a repeat gambler at the Venetian, a Nevada limited liability company. The Venetian operates a licensed Las Vegas casino. It followed the standard industry procedures when it extended credit to Nehme. Those procedures are set out by the Nevada Supreme Court in *Nguyen v. State*, 14 P.3d 515, 516-17 (Nev. 2000):

A gambler applies for casino credit by completing a standard credit application form. Once the casino approves the application and grants a line of credit to the gambler, the gambler may receive all or part of the credit line at a gambling table in the form of a "marker." The marker is an instrument, usually dated, bearing the name of the gambler, the name and account number of the gambler's bank, and the instruction "Pay to the Order of" the casino for a specific value in U.S. dollars. Once the gambler and a casino representative sign the marker, the gambler may then exchange the marker for gambling tokens, or chips. If the gambler does not pay the marker when he has finished gambling, the marker is outstanding and the casino may submit the marker to the gambler's bank for payment as if it were a check on the gambler's account at the bank.

In this case, Nehme applied for a line of credit with the Venetian on March 13, 2004 by completing a standard credit application form. In the Venetian credit application, Nehme

set out his name, address, social security number, and employment information. The bottom of the credit application provided, in pertinent part: "Before drawing on my line of credit, if granted, I agree to sign credit instruments in the amount of the draw. . . . Each draw against my credit line constitutes a separate loan of money. . . . I will sign a credit instrument in the amount of the loan." By signing the credit application, Nehme "agree[d] to repay all loans and draws against [his] credit line in accordance with the terms agreed to in [his] credit file." Most important for this appeal, the credit application provided: "The Venetian Resort-Hotel-Casino endorses responsible gaming. We will cancel or reduce your credit line upon your request."

Under Nehme's credit application, the Venetian approved a $200,000 initial credit line for Nehme in March 2004, and extended that credit line to $350,000 in May 2004 and then to $500,000 in July 2004. Nehme gambled at the Venetian several times in 2004 and 2005. On February 8, 2005, a Mr. Bennett, purporting to be Nehme's attorney, sent a return receipt letter to the Venetian "requesting that all credit lines established by [Nehme] or on his behalf immediately be terminated and that no further credit be extended to him under any circumstances." Mr. Bennett received a U.S. Postal Service return receipt that purports to show someone at the Venetian may have signed for the letter on February 11, 2005, over the address shown for the Venetian. By August 2005, Nehme had repaid all gambling debts he owed to the Venetian.

Nehme returned to the Venetian over Labor Day weekend in September 2005. Nothing in the record demonstrates Mr. Bennett's letter was questioned, rejected or answered by the Venetian, or withdrawn by Nehme directly or through a representative. Neither is there any proof that Nehme executed a new credit application.

On Labor Day, September 5, 2005, Nehme signed a casino

marker for $500,000 payable to the Venetian.[1] Nehme exchanged the marker for chips and lost all $500,000 worth of chips playing Blackjack. Nehme then left the Venetian with the marker outstanding. On January 5, 2006, the Venetian presented for payment the $500,000 marker to Bank of America, the bank specified on the marker, but the marker was returned for insufficient funds. The Venetian applied a $1,000 safekeeping deposit to the unpaid marker, such that it now claims Nehme owes it $499,000 in gambling debt, plus interest.

In July 2007, the Venetian sued Nehme in Nevada state court for (1) failure to pay a negotiable instrument (i.e., Nehme's casino marker); (2) breach of contract (i.e., the Venetian credit application agreement and the marker); and (3) unjust enrichment. That same month, Nehme removed this case to federal court in the District of Nevada based on diversity of citizenship jurisdiction. In April 2008, the Venetian filed a motion for summary judgment. Later that month Nehme filed an opposition, to which he attached an unsigned copy of the Bennett February, 2005, letter. Then, in September 2008, Nehme filed a cross-motion for summary judgment,

---

[1] By signing the marker, Nehme agreed to the following terms printed on the face of the marker:

I authorize payee to complete any of the following items on this negotiable instrument: (1) any missing amounts; (2) a date; (3) the name, account number and/or address and branch of any bank or financial institution; and (4) any electronic encoding of the above items. This information can be for any account from which I may now have and/or in the future have the right to withdraw funds, irrespective of whether I provide the information on the account to the payee. I acknowledge that I incurred the debt evidenced by this instrument in Nevada. I agree that any dispute regarding or involving this instrument, the debt, or the payee, be brought in a Nevada court and shall be governed by Nevada law. I hereby submit to the jurisdiction of any court, state or federal, in Nevada. In addition to any amounts authorized by law, I agree to pay all cost or collection, including the payee's attorneys fees and court costs, plus interest thereon at 18% APR.

to which he attached, in pertinent part, a signed copy of another Bennett letter, a postal service return receipt for the unsigned Bennett letter, and excerpts from the deposition testimony of Venetian employees.[2]

The district court, sua sponte and without a hearing, excluded the Bennett letters, the return receipt for the unsigned Bennett letter, and the deposition excerpts on the ground they were not properly authenticated.[3] The district court granted summary judgment to Nehme on the Venetian's unjust enrichment claim on the ground this claim is unavailable where a written contract (i.e., the credit application agreement) exists.[4] The district court then granted summary judgment to the Venetian on the claims of failure to pay a negotiable instrument and breach of contract, on the ground that no triable issue of fact remained as to the elements of those two claims and that there was no evidence to raise a triable issue of fact as to any of Nehme's affirmative defenses to liability. The district court also refused to consider Nehme's defense of contract rescission, in part because Nehme had not pleaded that defense in his answer.

Nehme filed a motion for reconsideration, to which he attached an affidavit from his attorney, Bennett, that authenti-

---

[2]Local Rule 7056 in the District of Nevada does not require Nehme to file his cross-motion for summary judgment at the same time as his opposition to the summary judgment motion; the district court considered the cross-motion.

[3]We note that Mr. Bennett did not represent Nehme in the proceedings before the district court. He did not inform the district court that he wrote and mailed the Bennett letter. We also note that the district court did not hold oral argument on the parties' cross-motions for summary judgment and, therefore, Nehme did not have an opportunity to respond to the district court's ruling as to lack of authenticity of foundational evidence, which excluded the Bennett letter and its return receipt.

[4]The Venetian did not cross-appeal the grant of summary judgment to Nehme on its unjust enrichment claim. Thus, this claim is not at issue on appeal.

cated the unsigned Bennett letter and its postal service return receipt, as well as properly authenticated deposition excerpts regarding the Venetian's credit line cancellation policy. The district court denied the motion, and Nehme timely appealed.

## Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's grant of summary judgment to "determine, viewing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in its favor, whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). Where the parties file cross-motions for summary judgment, the court must consider each party's evidence, regardless under which motion the evidence is offered. *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## Analysis

The district court granted summary judgment to the Venetian after it had excluded an unsigned copy of the Bennett letter attached as an exhibit to Nehme's opposition to the Venetian's motion for summary judgment, as well as a signed copy of the Bennett letter, a postal service return receipt for the unsigned Bennett letter, and deposition excerpts attached as exhibits to Nehme's cross-motion for summary judgment. Because the district court excluded the unsigned Bennett letter and its return receipt under an incorrect legal standard, and because under the correct legal standard those two items might be received in evidence—and if so, raise triable issues of material fact—as to Nehme's affirmative defense against the Venetian based on an alleged material breach of their credit application agreement, we reverse and remand to the district court to apply the correct legal standard.[5] We need not,

---

[5]We do not consider the signed Bennett letter, for which there is no return receipt, and which was addressed not to an employee at the Vene-

and do not, decide whether the district court's other evidentiary rulings were proper.

# I.

We review the district court's exclusion of evidence in a summary judgment motion for abuse of discretion. *Orr*, 285 F.3d at 773. Under *United States v. Hinkson*, 585 F.3d 1247, 1251, 1262 (9th Cir. 2009) (en banc), a district court abuses its discretion if it applies an incorrect legal standard to decide an issue. If, however, the district court applies the correct legal standard, there is no abuse of discretion unless the district court's findings of fact, and its application of those findings of fact to the correct legal standard, are illogical, implausible, or without support in inferences that may be drawn from facts in the record. *Id.*

The district court abused its discretion in excluding the Bennett letter and its postal service return receipt because the district court applied an incorrect legal standard to consider those pieces of evidence and, therefore, failed properly to consider whether the Bennett letter and its return receipt were authenticated by their distinctive characteristics.

**[1]** In *Orr*, we made clear that "unauthenticated documents cannot be considered in a motion for summary judgment." *Orr*, 285 F.3d at 773. The authentication of a document requires " 'evidence sufficient to support a finding that the matter in question is what its proponent claims.' " *Id.* (quoting Fed. R. Evid. 901(a)). A document *authenticated through personal knowledge* must be attached to an affidavit, and the affi-

---

tian, but rather to an employee at Caesars Palace, another Las Vegas casino. This signed letter suggests that Nehme also had a credit line at Caesars Palace, but the record is silent on this point and it is irrelevant to the present case. From this point forward, we therefore refer to the unsigned Bennett letter simply as "the Bennett letter."

ant must be a competent " 'witness who wrote [the document], signed it, used it, or saw others do so.' " *Id.* at 773-74 & n.8 (quoting Fed. R. Evid. 901(b)(1)). But the requirement that documents be authenticated through personal knowledge when submitted in a summary judgment motion "is limited to situations where exhibits are introduced by being attached to an affidavit" of a person whose personal knowledge is essential to establish the document is what it purports to be—that it is authentic. *Id.* at 778 n.24. Where documents are otherwise submitted to the court, and where personal knowledge is *not* relied upon to authenticate the document, the district court must consider alternative means of authentication under Federal Rules of Evidence 901(b)(4).[6] *Orr*, 285 F.3d at 777-78. Under Rule 901(b)(4), "documents . . . could be authenticated by review of their contents if they appear to be sufficiently genuine." *Orr*, 285 F.3d at 778 n.24 (noting that district courts have authenticated letters "by the linkage between the dates of postmarks and defendant's location on the days [the] letters [were] mailed" and a diary "by reviewing its contents").

**[2]** Here, the district court excluded the Bennett letter and its return receipt on the sole ground that those two pieces of evidence must be authenticated by a competent witness with personal knowledge of their authenticity. The Bennett letter was attached as an exhibit to Nehme's opposition to the Venetian's motion for summary judgment, and the return receipt for that letter was attached as an exhibit to Nehme's cross-motion for summary judgment. Neither was attached as an exhibit to an affidavit of a person offering his personal knowledge of how the document was prepared as the basis for the court to find the document is authentic. Thus, the district court applied an incorrect legal standard because, as set out above,

---

[6]Federal Rule of Evidence 901(b)(4) provides that authentication sufficient for admissibility can be satisfied by the object's "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Fed. R. Evid. 901(b)(4).

the Bennett letter and its return receipt could have been authenticated by review of their contents if they appeared to be sufficiently genuine.[7] In this respect, the Bennett letter was dated February 8, 2005, written on the letterhead of an attorney who stated he represented Nehme, addressed to Mr. Morcos at the Venetian, and printed a reference to the same certified mail number that is on the postal service return receipt.[8] The return receipt is date stamped February 11, 2005, three days after the letter's date, is also addressed to Mr. Morcos at the Venetian, and purports to be a "Domestic Return Receipt" for certified mail carrying the same certified mail number as does the Bennett letter. These characteristics could be sufficient to support a finding the Bennett letter was sent to the Venetian on February, 8, 2005, and was received by the Venetian on February 11, 2005.

[3] The district court, having relied on an incorrect legal standard, did not make a finding whether the Bennett letter and its return receipt could be authenticated by their distinctive characteristics under Federal Rule of Evidence 901(b)(4). Under *Hinkson*, the district court therefore abused its discretion in failing to apply the correct legal standard. Upon remand, application of the correct legal standard may lead to the admission of such items of proferred evidence.

## II.

Where, as here, the district court abuses its discretion, so to exclude evidence in a summary judgment motion, we must apply a harmless error analysis. *Orr*, 285 F.3d at 773. We will reverse the district court if the district court's evidentiary rul-

---

[7]Nehme does not contend that the return receipt is a self-authenticating document, and we need not, and do not, decide that issue.

[8]In lieu of a signature, the Bennett letter bears the phrase "Dictated but not Read for Expedient Delivery" followed by the name "Leon F. Bennett" in typeface. The Bennett letter then concludes with the text "LFB: vk" and "cc: Tom Nehme."

ing was "prejudicial"—i.e., consideration of improperly excluded evidence would have precluded a grant of summary judgment, or warranted a grant of summary judgment to the other party. *See id.* at 773, 779 n.27.

Here, after erroneously excluding the Bennett letter and its return receipt, the district court granted summary judgment to the Venetian on two claims against Nehme: (1) failure to pay a negotiable instrument (i.e., Nehme's unpaid casino marker); and (2) breach of contract (i.e., the Venetian credit application agreement and the marker). The district court did so on the ground that no triable issue of fact remained as to the elements of those two claims, and that there was no evidence to raise a triable issue of fact as to any of Nehme's affirmative defenses to liability. Those defenses, set out in Nehme's cross-motion for summary judgment, include: (1) the credit application agreement nullified the marker under the Nevada Uniform Commercial Code ("UCC"); (2) the breach of a material term of the credit application agreement discharged Nehme's duty to pay the marker under Nevada common law contract principles; and (3) Nehme unilaterally rescinded the credit application agreement by virtue of the Bennett letter.

Nevada substantive law controls in this diversity action. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."). The credit application agreement and the marker both specify Nevada law as the controlling law. The UCC is codified in Nevada at NRS 104.1101 *et seq.*[9] As set out below, the district court's exclusion of the Bennett letter and its return receipt upon an erroneous basis was not harmless error, because these items of evidence do raise a triable issue of fact as to Nehme's nullification defense under the UCC, and they raise a triable issue of fact as to Nehme's defense based on common law contract principles. We need not, and do not, address Nehme's rescission defense.

---

[9] All "NRS" references are to provisions of the Nevada Revised Statutes.

**A.**

The first claim in the Venetian's complaint against Nehme is for failure to pay the marker, which is a negotiable instrument and a check under the Nevada UCC.

**1.**

**[4]** The Venetian has a right to enforce the marker against Nehme as a valid debt obligation unless Nehme can establish a defense to liability. In Nehme's opposition to the Venetian's motion for summary judgment, he conceded that the marker "constitutes both a negotiable instrument and a check according to the definition of these terms in NRS 104.3104." Subsection 6 of NRS 104.3104 provides that "[a]n order that meets all of the requirements of subsection 1, . . . and otherwise falls within the definition of 'check' in subsection 6 is a negotiable instrument and a check." In pertinent part, subsection 1 defines a negotiable instrument as "an unconditional . . . order to pay a fixed amount of money . . . if it . . . [i]s payable on demand or at a definite time; and . . . [d]oes not state any other undertaking by the person promising or ordering payment to do any act in addition to the payment of money[.]" One definition of a check in subsection 6 is a "draft . . . payable on demand and drawn on a bank."[10]

**[5]** Here, the marker is a negotiable instrument and a check because it provides a mechanism for payment of $500,000 from Bank of America to the order of the Venetian,[11] is signed

---

[10]"A draft is a written order by the first party, called the drawer, instructing a second party, called the drawee (such as a bank), to pay money to a third party, called the payee." *Nguyen*, 14 P.3d at 517-18 (internal quotation marks and brackets omitted).

[11]It appears the line following the instruction "PAY TO THE ORDER OF" is blank, in which case the marker is bearer paper payable to the Venetian as the holder of the marker. *See, e.g.*, *Wilson County v. Third Nat'l Bank*, 103 U.S. 770, 776 (1880); *Gruber v. Baker*, 23 P. 858, 861 (Nev. 1890).

by Nehme,**¹²** and is payable on demand because it states no time or date of payment. *See Nguyen*, 14 P.3d at 518. On the face of the marker, the order is unconditional and states no undertakings by Nehme other than to pay a specific sum of money. The marker therefore was valid and enforceable as a negotiable instrument under Nevada law. *See Mandalay Resort Group v. Miller (In re Miller)*, 292 B.R. 409, 414 (B.A.P. 9th Cir. 2003) (holding that a casino marker, and the gambling debt the marker represents, " 'are valid and may be enforced by legal process' " (quoting NRS 463.368(1)). The Venetian presented the marker to Bank of America for payment, and the marker was returned for insufficient funds. Thus, the Venetian has a right to enforce the marker against Nehme unless Nehme can establish a defense to liability. *See* NRS 104.3103 cmt. 2 ("Dishonor by any drawee named in the draft entitles the holder to rights of recourse against the drawer[.]"); *see also* NRS 104.3503 ("[N]otice of dishonor is no longer relevant to the liability of a drawer[.]").

We now turn to consider whether the evidence—including the erroneously rejected items—properly considered, could make out triable issues of fact as to whether the Venetian was indeed a holder in due course, or, to the contrary, a holder with knowledge of personal defenses.

**2.**

The Bennett letter and its return receipt raise a triable issue of fact as to whether the Venetian's right to enforce the marker against Nehme is subject to Nehme's defense based on common law contract principles and the UCC affirmative defense.

---

**¹²**On appeal, Nehme contends for the first time that the Venetian never authenticated the marker. Even assuming this argument is not waived, it is to no avail. *See* Fed. R. Evid. 902(9) ("Commercial paper, signature thereon, and documents relating thereto" are self-authenticating).

**[6]** At the outset, the Venetian is not a "holder in due course," i.e., "one who takes the instrument (1) for value, (2) in good faith and (3) without notice that it is overdue or has been dishonored or of any defenses or claims to it." *Id*. This is important because "[h]older in due course status operates to insulate the holder from certain defenses to the instrument of any party with whom the holder has not dealt." *Id.* (citing NRS 104.3305). The Venetian had dealt with Nehme, and was a party to both the credit application and the marker. If the Venetian is proved to have knowledge of the purported credit application cancellation, per the Bennett letter, the Venetian was aware of defenses to the marker. Nevada law makes the Venetian "subject to all defenses of [Nehme,] a party with whom the holder has dealt." *Id.* (citing NRS 104.3305). "These defenses comprise those specifically stated in Article 3 [of the UCC as codified in Nevada] *and* those based on common law contract principles." NRS 104.3305 cmt. 2 (emphasis added).

Nehme contends that "the Venetian was under a contractual duty to cancel Nehme's credit line following receipt of the Bennett letter." According to Nehme, the Venetian's failure to cancel his credit line, and its decision to extend him $500,000 of credit under the marker, was a material breach of the credit application agreement and, therefore, discharged his duty to pay the marker under common law contract principles.

**[7]** Under Nevada law, "[a] breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement." *Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987). Whether a party has breached a contract and whether the breach is material are questions of fact. *Hoffman v. Eighth Judicial Dist. Court*, 523 P.2d 848, 850 (Nev. 1974). It is well-established at common law that "[a] breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty." Restatement (First) of Contracts § 397. Nevada courts

have long recognized this principle. *See, e.g.*, *Thornton v. Agassiz Constr., Inc.*, 799 P.2d 1106, 1108 (Nev. 1990) ("Payment of the purchase price is excused where respondent's breach was material."); *Young Elec. Sign Co. v. Fohrman*, 466 P.2d 846, 847 (Nev. 1970) ("The lessee's material breach in failing to pay rent excused further performance by the lessor." (citing Restatement (First) of Contracts § 397)).

[8] Here, the credit application agreement was a bilateral contract between Nehme and the Venetian. Nehme promised "to repay all loans and draws against [his] credit line," to "sign a credit instrument in the amount of [each] loan," and "to sign credit instruments in the amount of [each] draw." In return, the only express promise that the Venetian made to Nehme on the face of the credit application was that, if it granted Nehme a line of credit, it would "cancel or reduce [his] credit line upon [his] request." The Venetian made this promise for the purpose of ensuring "responsible gaming." There is a triable issue of fact as to whether this credit cancellation promise, as the only express promise that the Venetian made to Nehme on the face of the credit application agreement, is a material term of the bilateral contract between Nehme and the Venetian. *See Powers v. United Servs. Auto. Ass'n*, 962 P.2d 596, 601 (Nev. 1998) ("[W]here materiality must be shown by matters outside the terms of the contract, it is a question of fact." (internal quotation marks omitted)).

[9] The more difficult question is whether the credit application agreement and the marker were part of the same transaction, such that a material breach of the credit application could serve as a breach of contract defense to the enforcement of not only the credit application agreement, but also the marker. The parties do not offer, nor can we find, any authority that directly resolves this question as a matter of law. In *Nguyen*, however, the Nevada Supreme Court did suggest that, under "standard industry procedures" in Nevada, a casino marker generally goes hand in hand with a prior credit application agreement. 14 P.3d at 516-17. Other courts, apply-

ing Nevada law, have made the same suggestion. *See, e.g.*, *In re Miller*, 292 B.R. at 414 ("Debtor acknowledges in the application *and* markers that he incurred [gambling] debt in Nevada." (emphasis added)); *Fleeger v. Bell*, 95 F. Supp. 2d 1126, 1127 (D. Nev. 2000) ("Upon approval of this credit application by Desert Palace, a patron may request the issuance of . . . casino 'markers.' "); *Casino-Hotel v. Caram*, 762 F. Supp. 286, 288 (D. Nev. 1991) ("The application *and* the [marker] which Defendant signed create an enforceable debt under Nevada [law]." (emphasis added)); *see also Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 521 (8th Cir. 2002) ("Armstrong signed a 'Casino Credit Application' in order to obtain markers from Harrah's.").

**[10]** We therefore conclude that a casino marker and a credit application agreement may be, but need not be, part of the same transaction. Whether a particular casino marker relates to a particular credit application agreement, such that they are part of the same transaction, is necessarily a question of fact. First, and most importantly, the evidence from the credit application's own language seems to establish that unless and until Nehme signed the credit application, the Venetian would not accept his marker and give him chips. Thus, there is a triable issue of fact as to whether Nehme's marker was part of the same transaction as his prior credit application agreement with the Venetian. Although it may be possible to view Nehme's marker and the parties' credit application agreement as two discrete credit transactions, a reasonable jury could find that the marker was part of the same underlying transaction as the credit application agreement—i.e., that Nehme received the marker because he drew on a $500,000 line of credit he had established at the Venetian through the prior credit application agreement. Notably, the credit application agreement contemplated that Nehme would sign future "credit instruments," such as the marker. Moreover, the marker bears the same account number as appears on the credit application agreement. Finally, the $500,000 marker was for the exact amount of Nehme's credit limit at

the Venetian, as Nehme had repaid all prior gambling debts before he signed the marker.

**[11]** The Bennett letter and its return receipt therefore raise a triable issue of fact as to whether the Venetian was obligated, per the terms of the credit application agreement, to cancel Nehme's credit in February 2005—seven months before Nehme signed the marker for $500,000, the full extent of his credit line at the Venetian. Indeed, the Bennett letter clearly instructed the Venetian to cancel Nehme's credit line and to extend him no further credit under any circumstances. *See* Black's Law Dictionary 233-34 (9th ed. 2009) (defining cancel as "to terminate a promise, obligation, or right."). Thus, if the Venetian had received the Bennett letter and simply failed to cancel Nehme's credit line through which markers were issued, the Venetian may well have been in material breach of the credit application agreement, such that Nehme's duty to repay the marker would be discharged under common law contract principles.

If, alternatively, the Venetian had received the Bennett letter, cancelled Nehme's credit line, and simply reinstated that credit line based on Nehme's signing a $500,000 marker, without the formality of a new credit application or any other requirements, then the Venetian's promise to ensure "responsible gaming" would be illusory. *See Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989) ("Preference must be given to reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory." (internal quotation marks omitted)).

Furthermore, Nevada Gaming Commission Regulation 5.170(4) requires every gaming licensee, that engages in the issuance of credit, to implement a program that allows casino-patrons to self-limit their access to the issuance of credit. Such programs are required to contain "[s]tandards and procedures that allow a patron to be prohibited from access to check cashing, the issuance of credit, and the participation in

direct mail marketing of gaming opportunities." *Id*. The deposition testimony of the Venetian casino executive, Manny Morcos, establishes that the Venetian implemented such a program, and that Nehme's credit line would have been shut down immediately upon receipt of the Bennett letter.[13] Morcos's testimony further establishes that Nehme's credit could not be reinstated without the permission of the Venetian's legal department. Under Venetian's program, Nehme would be required to send another letter requesting to open his credit line and the Venetian's legal department would have to approve this request before any credit could be extended to Nehme.

[12] Under Nevada law, a contract " 'may be explained or supplemented . . . [b]y course of dealing or usage of trade . . . or by course of performance[.]' " *United Services Auto Ass'n v. Schlang*, 894 P.2d 967, 971 (Nev. 1995) (citing NRS 104.2202(1)). The meaning of the Venetian's promise that it "endorses responsible gaming" and it "will cancel or reduce" the credit line can thus be explained by the Venetian's program that is meant to allow casino-patrons to self-limit their access to the issuance of credit. Thus, the Venetian's promise to "cancel or reduce" the credit line could be interpreted to mean that once a credit line is cancelled, the lender cannot lend under it until a casino-patrol requests to reinstate his credit and until the Venetian's legal department approves such a request. In light of these facts, a jury could conclude that the Venetian committed the first breach of the credit application

---

[13]Morcos's deposition was attached to a motion for reconsideration and not an opposition to summary judgment. However, we can consider it as part of the record. *See Carmona v. Toledo*, 215 F.3d 124, 132 n.7 (1st Cir. 2000) (" [An] affidavit . . . attached to a motion for reconsideration, not an opposition to summary judgment . . . should be considered part of the record."); *see also,* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2722 at 378 (3d ed. 1998) ("An affidavit of a party that is on file in the case will be considered by the court regardless of the purpose for which it was prepared and filed.").

when it extended Nehme credit after it received the Bennett letter.

**[13]** Accordingly, the district court's improper exclusion of the Bennett letter and its return receipt was harmful because those pieces of evidence raise a triable issue of fact as to whether Venetian's right to enforce the marker against Nehme is subject to Nehme's defense based on common law contract principles.[14]

## B.

**[14]** The second claim in the Venetian's complaint against Nehme is for breach of the Venetian credit application agreement, the unpaid casino marker, or both. As set out above, a triable issue of fact remains as to whether the Venetian materially breached the credit application agreement by not cancelling Nehme's credit upon receipt of the Bennett letter and thereby discharged Nehme's obligations under the credit application. Moreover, a triable issue of fact remains as to whether the marker related to the same bilateral contract as the credit application agreement. Notably, the credit application contemplated the signing of future markers, the account number on the marker matched that on the credit application, and the marker was for the full extent of Nehme's credit line at the Venetian as established by the credit application agreement and subsequent credit line increases. Accordingly, the district court's improper exclusion of the Bennett letter and its return receipt was harmful because those items, if admitted into evidence, raise triable issues of fact as to whether Nehme breached a contract he had with the Venetian.

---

[14]We do not address the unrelated issue of whether Nehme had a "gambling problem," which, in any event, is not a defense to a gambling debt under Nevada law. *See* NRS 463.368(6) ("A patron's claim of having a mental or behavioral disorder involving gambling . . . [i]s not a defense in any action . . . to enforce a credit instrument or the debt that the credit instrument represents.").

## Conclusion

For the reasons set out above, we reverse the district court's grant of summary judgment to the Venetian. We remand this case to the district court for further proceedings, including its determining whether the Bennett letter and its return receipt are admissible under Federal Rule of Evidence 901(b)(4), and if so, whether Nehme can prevail on his affirmative defense against the Venetian based on an alleged material breach of the credit application agreement.

**REVERSED** and **REMANDED.**