FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KONSTANTIN ZOGGOLIS,
*Plaintiff-Appellant*,

v.

WYNN LAS VEGAS, LLC,
*Defendant-Appellee.*

No. 11-17939

D.C. No.
2:11-cv-01562-PMP-PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, Senior District Judge, Presiding

Argued and Submitted
November 6, 2013—San Francisco, California

Filed September 23, 2014

Before: Andrew J. Kleinfeld, Sidney R. Thomas,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Rawlinson

## SUMMARY[*]

### Nevada State Law

The panel reversed the district court's dismissal, due to failure to exhaust claims before the Nevada Gaming Control Board, of Konstantin Zoggolis's Nevada state law breach of contract and recoupment claims concerning gambling debts that Zoggolis owed to Wynn Las Vegas.

The panel held that Zoggolis was not required to exhaust his claims before the Gaming Control Board because the markers that underlay this case were credit instruments. The panel also held that because the markers were credit instruments, Zoggolis' claims did not trigger the Gaming Control Board's exclusive jurisdiction over a "gaming debt that is not evidenced by a credit instrument" under Nev. Rev. Stat. § 463.361(2). The panel concluded that Zoggolis's claims must be resolved in the same manner as any other dispute involving the enforceability of a negotiable instrument. The panel expressed no view on the outcome of the proceedings on remand.

## COUNSEL

Gary Logan, Las Vegas, Nevada, for Plaintiff-Appellant.

Lawrence J. Semenza III, Semenza & Semenza, LLP, Las Vegas, Nevada, for Defendant-Appellee.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

RAWLINSON, Circuit Judge:

Appellant Konsantin Zoggolis (Zoggolis) challenges the district court's dismissal of his state law breach of contract and recoupment claims concerning gambling debts that Zoggolis owed to Appellee Wynn Las Vegas (Wynn). Zoggolis contends that the district court erred in dismissing his complaint due to Zoggolis' failure to exhaust his claims before the Nevada Gaming Control Board. Because Zoggolis' gambling debts were evidenced by credit instruments in the form of markers, we reverse the district court's dismissal of Zoggolis' claims.

## I. BACKGROUND

In his Complaint, Zoggolis alleged that he entered into a credit agreement with Wynn for a $150,000 credit line. The credit agreement provided that "[b]efore drawing on [his] line of credit, if granted, [Zoggolis] agree[d] to sign credit instruments (i.e. checks) in the amount of the draw." Zoggolis also "authoriz[ed] [Wynn] to complete any of the following missing items on these credit instruments: (1) the name of a payee; (2) any missing amounts; (3) a date; (4) the name, account, number and/or address and branch of any banks and financial institutions and (5) any electronic encoding of the above items." Zoggolis agreed that "each draw against [his] credit line [was] a separate advance of money by [Wynn]. If [Zoggolis] receive[d] the advance before [he] executed a credit instrument, [he] promptly [would] sign a credit instrument in the amount of the advance."

According to Zoggolis, on November 12, 2008, and as provided in Nevada law, he directed Wynn to limit his credit line to $250,000. The Complaint alleges that Wynn agreed one day later, in writing, that Wynn would honor Zoggolis' request to limit his credit line to $250,000.[1]

Zoggolis alleged that Wynn breached the credit agreement because Wynn did not cancel or reduce Zoggolis' credit line as agreed, and that any duty to repay markers in excess of $250,000 was discharged. Zoggolis also asserted a recoupment claim for $1,300,000 based on eleven markers Wynn issued to him in excess of the restricted credit line. In addition, Zoggolis sought $1,050,000 in damages representing "the amount of casino credit extended to him beyond his self-limited amount of $250,000.00. . . ." Finally, Zoggolis sought injunctive relief premised on Wynn's initiation of criminal proceedings due to the unpaid markers.

Wynn filed a motion to dismiss Zoggolis' complaint because Zoggolis failed to pursue his claims before the Nevada Gaming Control Board as required by Nev. Rev. Stat. § 463.361. The district court granted Wynn's motion and dismissed Zoggolis' breach of contract and recoupment claims because the claims arose "from a dispute concerning a gambling debt which requires that [Zoggolis] exhaust

---

[1] Zoggolis' request was made pursuant to Nevada Gaming Control Regulation § 5.170(4), which provides:

> Each licensee that engages in the issuance of credit, check cashing, or the direct mail marketing of gaming opportunities, shall implement a program . . . that allows patrons to self-limit their access to the issuance of credit, check cashing, or direct mail marketing by that licensee. . . .

administrative remedies pursuant to N.R.S. 463.361 . . . ."[2] Zoggolis filed a timely notice of appeal.

## II. STANDARD OF REVIEW

"We review de novo the district court's dismissal for lack of subject matter jurisdiction. . . ." *Tritz v. United States Postal Serv.*, 721 F.3d 1133, 1136 (9th Cir. 2013) (citation omitted).

## III.    DISCUSSION

The district court held that dismissal of Zoggolis' claim was warranted because the dispute concerned "a gambling debt." However, dismissal was warranted only if Zoggolis' "gambling debt" was of the type required to be exhausted before the Gaming Control Board under Nevada law.

Nevada courts "traditionally followed the common law doctrine . . . that a gaming debt is not legally enforceable. . . ." *Sigel v. McEvoy*, 707 P.2d 1145, 1146 (Nev. 1985) (citations omitted). The lack of enforceability encompassed "gaming debts incurred between two players in the same game or between a casino and a patron . . ." *Id.* at 1147 n.2. However, in 1983, the Nevada legislature enacted Nev. Rev. Stat. § 463.361(1), which provides "that gaming debts not evidenced by a credit instrument are void and unenforceable and do not give rise to any administrative or civil cause of action." *Id.* at 1146 (internal quotation marks

---

[2] The district court also held that Zoggolis' claim for injunctive relief was moot because Wynn had already referred Zoggolis' unpaid markers to the Clark County District Attorney's Office. Zoggolis does not challenge this ruling.

omitted).   This part of the statute is consistent with the common-law prohibition against enforcement of gaming debts.  In other words, gaming debts not evidenced by a credit instrument are subject to the common-law doctrine precluding enforcement of gaming debts.  That would be the end of the story but for Nev. Rev. Stat. § 463.361(2), which provides that "[a] claim by a patron of a licensee for payment of a gaming debt that is not evidenced by a credit instrument may be resolved . . . (a) By the [Gaming Control] Board . . ."  This statute has been interpreted as conferring exclusive jurisdiction upon the Gaming Control Board "to resolve a disputed claim . . . by a patron of a gaming licensee for payment of a gambling debt that is not evidenced by a credit instrument. . . ."  *Sengel v. IGT*, 2 P.3d 258, 260 (Nev. 2000) (citation and footnote reference omitted).   In sum, under Nevada's statutory scheme, a proceeding before the Gaming Control Board is the only remedy available "to enforce a gaming debt not evidenced by a credit instrument . . ."  *Id.* (citation omitted).   To that extent, the Nevada legislature "modified the common law prohibition against enforcement of gaming debts. . . ."  *Sigel*, 707 P.2d at 1146.[3]

---

[3] Nev. Rev. Stat. § 463.361 provides:

> 1.  Except as otherwise provided in NRS 463.361 to 463.366, inclusive, and 463.780, gaming debts that are not evidenced by a credit instrument are void and unenforceable and do not give rise to any administrative or civil cause of action.

> 2.  A claim by a patron of a licensee for payment of a gaming debt that is not evidenced by a credit instrument may be resolved in accordance with NRS 463.362 to 463.366, inclusive:  (a) By the Board; or (b) If the claim is for less than $500, by a hearing examiner designated by the Board.

Nev. Rev. Stat. § 463.01467 defines a credit instrument as "a writing which evidences a gaming debt owed to a person who holds a nonrestricted license at the time the debt is created . . ." A licensee is defined as "any person to whom a valid gaming license . . . has been issued. . . ." *Id.* n.1 (quoting Nev. Rev. Stat. § 463.0171). It is undisputed that Wynn is a licensee. Therefore, as between Wynn and Zoggolis, a licensee and a patron, if the gaming debt is not evidenced by a credit instrument, the only way to enforce that gaming debt is through a proceeding before the Gaming Control Board. *See Sengel*, 2 P.3d at 260. Although these statutes do not address the situation where the gaming debt *is* evidenced by a credit instrument, as discussed below, Nevada cases indicate that a gaming debt evidenced by a credit instrument is enforced in the same manner as any other negotiable instrument.

To resolve this appeal, we must decide whether markers like the ones issued to Zoggolis by Wynn are credit instruments under Nevada law. If the markers were credit instruments, the Gaming Control Board would not have exclusive jurisdiction over Zoggolis' claims, and no exhaustion would be required. *See* Nev. Rev. Stat. § 463.361(2) (addressing only gaming debts *not* evidenced by a credit instrument). The Nevada Supreme Court has defined a marker as "an instrument, usually dated, bearing the following information: the name of the player; the name, location, and account number of the player's bank; and the instruction 'Pay to the Order of' the casino for a specific value in United States dollars." *Nguyen v. State*, 14 P.3d 515, 516 (Nev. 2000). Part of the content of the marker is a representation by the payor "that the amount drawn by the marker is on deposit in the referenced financial institution, and that he guarantees payment. . . ." *Id.* When a casino

patron has completed his gaming activity, he either pays the full amount reflected in the marker or leaves the marker outstanding with the casino. "If the marker remains outstanding, casino personnel attempt to notify the patron and, after a specified period of time, submit the marker to the patron's bank for collection. . . ." *Id.* (footnote reference omitted).

The markers issued to Zoggolis contained the information delineated in *Nguyen*. In the accompanying credit agreement, Zoggolis committed to "sign credit instruments (i.e. checks) in the amount of the draw," and authorized Wynn "to complete any of the following on these credit instruments: (1) the name of a payee; (2) any missing amounts, (3) a date, (4) the name, account number, and/or address and branch of any banks and financial institutions, and (5) any electronic coding of the above items. . . ." Zoggolis was also required to "promptly . . . sign a credit instrument in the amount of [an] advance." The markers issued by Wynn were signed by Zoggolis, contained the requisite credit instrument information contemplated by the credit agreement, and confirmed that the marker was "identical to a personal check."

In *Nguyen*, the Nevada Supreme Court reviewed Nguyen's conviction for drawing and passing a check without sufficient funds. The genesis of the criminal charges was a series of markers issued at several licensed Las Vegas gaming establishments. *See* 14 P.3d at 516. The Nevada Supreme Court framed the primary issue as whether the criminal statute prohibiting the issuance of "bad checks, applies to gaming credit instruments commonly known as markers." *Id.* at 517 (internal quotation marks omitted). The Nevada Supreme Court noted that the applicable criminal statute

prohibits passing a check or draft to obtain credit from a licensed gaming establishment without sufficient funds to pay the check or draft upon presentation. *See id.* Although the governing statute does not define "check or draft," the court referenced the Uniform Commercial Code provisions governing negotiable instruments, as codified in the Nevada Statutes. *See id.* at 517–18. Those provisions define "check" as "an instrument drawn upon a bank and payable on demand, signed by the drawer, containing an instruction to pay a certain amount to another party. . . ." *Id.* at 518 (footnote reference omitted). The court noted that an instrument may be a check even though on its face it bears a different name. *See id.*

The court opined that the "bad check statute" applies to "instruments that are drawn upon a bank, payable on demand, signed by the payor, and which instruct the bank to pay a certain amount to the payee." *Id.* The court described the markers as checks because they provided for payment of a specific sum of money drawn from a bank on demand. *See id.* The court rejected the argument that the markers represented a loan rather than a check. *See id.*

Our decision in *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526 (9th Cir. 2011) bolsters our conclusion that the markers are credit instruments under Nevada law. In that case, we considered whether the Venetian, a hotel and casino operated by Las Vegas Sands, LLC, could enforce a marker. *See id.* at 529. We observed that:

> A marker is a *gambling credit instrument* that allows a gambler to receive all or part of the credit line the casino has approved for him, based on the gambler's prior credit

> application with the casino. Once the gambler and a casino representative sign the marker, the gambler may exchange the marker for gambling tokens, or chips. If the gambler does not pay the marker when he has finished gambling, the marker is outstanding and the casino may later submit the marker, *like a check*, to the gambler's bank for payment.

*Id.* (emphases added). Applying Nevada's statutory framework for gambling debts, we concluded:

> Here, *the marker is a negotiable instrument and a check* because it provides a mechanism for payment of $500,000 from Bank of America to the order of the Venetian, is signed by Nehme, and is payable on demand because it states no time or date of payment. On the face of the marker, the order is unconditional and states no undertakings by Nehme other than to pay a specific sum of money. The marker therefore was valid and enforceable as a negotiable instrument under Nevada law. . . .

*Id.* at 535 (emphasis added) (citations and footnote references omitted).

Our conclusion is consistent with other rulings describing markers as credit instruments under Nevada law. *See, e.g.*, *Summa Corp. v. State Gaming Control Bd.*, 649 P.2d 1363, 1364 (Nev. 1982), *as modified*; *Miller v. Miller (In re Miller)*, 292 B.R. 409, 411 (9th Cir. B.A.P. 2003).

Markers representing gambling debt have been variously characterized as checks, negotiable instruments and credit instruments. *See Nguyen*, 14 P.3d at 518; *see also Nehme*, 632 F.3d at 529, 535. Regardless of the label assigned, it is evident that courts in Nevada construe a marker to represent a gaming debt evidenced by a credit instrument as that term is used in Nev. Rev. Stat. § 463.361. *See Nguyen*, 14 P.3d at 517 (describing a marker as a credit instrument). In holding that Zoggolis was required to exhaust his claims before the Gaming Control Board, the district court did not have the benefit of the parties' factual clarification on appeal concerning the nature of Zoggolis' gaming debt. During argument, Wynn acknowledged that Zoggolis' claims were predicated on several markers and that those markers were credit instruments under Nevada law.[4] Because Zoggolis' gaming debts were evidenced by credit instruments, it is now apparent that Zoggolis was not required to exhaust his claims before the Gaming Control Board. *See* Nev. Rev. Stat. § 463.361.

Relying on Nev. Rev. Stat. § 463.368(1), Wynn asserts that only gaming licensees, not patrons, may challenge gambling debts in court. Wynn's argument is unavailing. Pursuant to Nev. Rev. Stat. § 463.368(1), "[a] credit instrument accepted on or after June 1, 1983, and the debt that the credit instrument represents are valid and may be enforced by legal process." Although § 463.368(1) provides

---

[4] In response to the panel's request for a more legible copy of the credit agreement, Wynn also provided copies of the markers referenced in the Complaint. The submitted markers only confirmed our conclusion that the Gaming Control Board lacked exclusive jurisdiction over Zoggolis' claims in light of Wynn's concession that the markers referenced in the Complaint are credit instruments.

that a licensee may enforce a gaming debt premised on a credit instrument, it does not provide that only licensees may litigate a gaming debt in court. *See id.* Rather, Nev. Rev. Stat. § 463.361(1) provides the only express limitation on enforcement of a gaming debt through litigation. *See* Nev. Rev. Stat. § 463.361(1) ("[G]ambling debts that are not evidenced by a credit instrument are void and unenforceable and do not give rise to any administrative or civil cause of action."). If the Nevada legislature intended to completely deprive patrons of the ability to litigate gaming debts, it could have easily drafted Nev. Rev. Stat. § 463.361(1) to provide that no gaming debts give rise to "any administrative or civil cause of action" on the part of gamblers, rather than addressing only gaming debts not evidenced by a credit instrument. *Id.* Because the Nevada legislature only limited enforcement of gaming debts that are not evidenced by a credit instrument, the obvious implication is that enforcement of gaming debts evidenced by a credit instrument is not so limited. Indeed, as discussed earlier, we have previously recognized the enforceability of gaming debts evidenced by a credit instrument. *See Nehme*, 632 F.3d at 536–37 (recognizing the potential of a defensive claim by the patron against the casino for failure to reduce the line of credit upon request).

Wynn's reliance on *Weisbrod v. Fremont Hotel, Inc.*, 326 P.2d 1104 (Nev. 1958) is also misplaced. In that case, the Nevada Supreme Court considered a patron's claim that a casino had improperly refused to pay him $12,500 in keno winnings. *See Weisbrod*, 326 P.2d at 1104. The Nevada Supreme Court opined that "[i]n 1872 it was established as the law of this state that an action does not lie for the collection of money won in gambling. . . ." *Id.* (citation omitted). Based on existing law, the Nevada Supreme Court

held that the patron was unable to pursue his claim in court. *See id.* at 1105. Notably, *Weisbrod* was decided prior to the Nevada legislature's 1983 modification of "the common law prohibition against enforcing gaming debts." *Sigel*, 707 P.2d at 1146.

## IV.    CONCLUSION

Because the markers that underlie this case are credit instruments under Nevada law, Zoggolis was not required to exhaust his claims before the Gaming Control Board. Because the markers are credit instruments, Zoggolis' claims did not trigger the Gaming Control Board's exclusive jurisdiction over "a gaming debt that is not evidenced by a credit instrument . . ." Nev. Rev. Stat. § 463.361(2). Rather, Zoggolis' claims must be resolved in the same manner as any other dispute involving the enforceability of a negotiable instrument. *See Nehme*, 632 F.3d at 535–39. We express no view on the outcome of the proceedings on remand. We hold only that Zoggolis is not required to exhaust his claims before the Gaming Control Board.

**REVERSED and REMANDED.**