**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TULALIP TRIBES OF WASHINGTON,
*Plaintiff-Appellant*,

v.

STATE OF WASHINGTON;
WASHINGTON STATE GAMBLING
COMMISSION; DAVID TRUJILLO,
Director of the Washington State
Gambling Commission, in his
official capacity; JAY INSLEE,
Governor of the State of
Washington, in her official capacity,
*Defendants-Appellees*.

No. 13-35464

D.C. No.
2:12-cv-00688-
RAJ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted
December 11, 2014—Seattle, Washington

Filed April 17, 2015

Before: M. Margaret McKeown, Richard C. Tallman,
and John B. Owens, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Tribal-State Gaming Compacts

The panel affirmed the district court's judgment in an action seeking amendment of a tribal-state gaming compact to enable the Tulalip Tribes of Washington to acquire additional licenses to video player terminals for Class III gaming under the Indian Gaming Regulatory Act.

The panel held that the district court did not err in its consideration of the parties' simultaneous cross-motions for summary judgment.

Distinguishing *Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095 (9th Cir. 2006), the panel held that a "most-favored tribe" clause in the compact did not require the State of Washington to adopt Tulalip's amendment, which did not mirror the restrictions set forth in another tribe's compact.

### COUNSEL

Lisa M. Koop (argued), Office of the Reservation Attorney, Tulalip Tribes of Washington, Wulalip, Washington; Phillip E. Katzen, Kanji & Katzen, PLLC, Seattle, Washington; Riyaz A. Kanji, David Giampetroni, and Philip H. Tinker, Kanji & Katzen, PLLC, Ann Arbor, Michigan, for Plaintiff-Appellant.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Robert W. Ferguson, Attorney General, and Callie M. Castillo (argued), Assistant Attorney General, Olympia, Washington, for Defendants-Appellees.

Craig J. Dorsay and Lea Ann Easton, Dorsay & Easton LLP, Portland, Oregon, for Amicus Curiae Samish Indian Nation.

## OPINION

McKEOWN, Circuit Judge:

This appeal requires us to interpret a tribal–state gaming compact between the Tulalip Tribes of Washington ("Tulalip") and the State of Washington. More specifically, at issue are electronic scratch ticket and online lottery games that use video player terminals. Tulalip asks us to force the State to amend the compact so that Tulalip can acquire additional licenses to these terminals. Citing the "most-favored tribe" clause in its compact, Tulalip argues that it is entitled to what it characterizes as the "more favorable terms" available to the Spokane Tribe through a mechanism known as the Inter-Tribal Fund. We disagree. We conclude that the terms of the compact do not require the State to adopt Tulalip's amendment.

## BACKGROUND

### I.  THE LEGAL FRAMEWORK OF TRIBAL GAMING

This dispute occurs against the backdrop of many iterative changes to tribal–state gaming compacts, so we begin with the basics of tribal gaming. The Indian Gaming Regulatory Act ("IGRA"), which was passed by Congress in 1988,

provides a framework for "the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). IGRA "provide[s] a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players." *Id.* § 2702(2).

Under IGRA, lawful gaming is divided into three classes, each of which is subject to different regulations. We have previously summarized the classes:

> Class I gaming covers "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6). Class II gaming includes bingo and card games that are explicitly authorized by a state or "not explicitly prohibited by the laws of the State and are [legally] played at any location in the State." *Id.* § 2703(7)(A)(ii). Class II gaming specifically excludes banked card games and slot machines.

*Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 715 (9th Cir. 2003). Class III gaming, the subject of this appeal, includes "all forms of gaming that are not class I gaming or class II gaming," 25 U.S.C. § 2703(8), such as slot machines and other "high-stakes games usually associated

with casino-style gambling," *Artichoke Joe's Cal. Grand Casino*, 353 F.3d at 715.

For class III gaming to be lawfully conducted on tribal lands, three conditions must be satisfied: "(1) authorization by an ordinance or resolution of the governing body of the Indian tribe and the Chair of the National Indian Gaming Commission . . . ; (2) location in a state that permits such gaming for any purpose by any person, organization, or entity; and (3) the existence of a Tribal–State compact approved by the Secretary of the Interior." *Id.* at 715–16 (footnote omitted) (citing 25 U.S.C. § 2710(d)(1)).

In Washington, the process for entering into tribal gaming compacts is governed by both federal and state law—IGRA and the Revised Code of Washington § 9.46.360. The process begins when a tribe asks the state to enter into negotiations for a gaming compact. 25 U.S.C. § 2710(d)(3)(A); Wash. Rev. Code § 9.46.360. The Executive Director of the Washington State Gambling Commission is authorized to negotiate on behalf of the state. Wash. Rev. Code § 9.46.360(2). Following approval by the Commission, the proposed compact is sent to the Governor for review and execution. *Id.* § 9.46.360(3), (6). Once the Governor and the tribe execute a compact, or an amendment to a compact, the U.S. Secretary of the Interior reviews it and it takes effect after the Secretary's approval has been published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B).

## II. THE TULALIP COMPACT

In 1991, Tulalip and the State of Washington signed a tribal–state gaming compact (the "Tulalip Compact"), an agreement that has since been amended numerous times.

A 1998 amendment to the Tulalip Compact authorized Tulalip to operate a Tribal Lottery System, which authorizes tribes to operate electronic scratch ticket and online lottery games that use video player terminals. According to Tulalip, "the terminals resemble video slot machines." The terms of the Tribal Lottery System were collectively negotiated between the State and twelve tribes, including Tulalip, and resulted in amendments to their gaming compacts. Tulalip's amendment became effective on January 28, 1999. *See* Notice of Amendment to Approved Tribal–State Compact, 64 Fed. Reg. 4,460-04 (Jan. 28, 1999).

The Tribal Lottery System rules are laid out in "Appendix X" to the Tulalip Compact. Section 12 of Appendix X prescribes how terminals are allocated to tribes. Each tribe receives a base allocation of the right to operate 675 terminals after one year. A tribe may increase the number of authorized terminals, up to an overall limit of 1500, by acquiring unused allocation rights from any "[e]ligible tribe," that is, a compacting tribe with gaming rights consistent with Appendix X. Any such acquisition or transfer of unused allocation rights "shall be made only pursuant to a plan approved by no less than a majority" of eligible tribes. Appendix X § 12.4.1. Such a terminal allocation plan exists among the tribes.

Some aspects of the Tribal Lottery System changed through a 2007 amendment to the Tulalip Compact. The new terms were also collectively negotiated, this time between the State and the twenty-seven Washington tribes with gaming compacts, including Tulalip. The negotiations concluded in February 2007, and Tulalip and the State executed the amendment in March 2007. The amendment became effective on May 31, 2007. *See* Notice of Amendment to

Approved Tribal–State Compact, 72 Fed. Reg. 30,392-01 (May 31, 2007).

The updated terms for the Tribal Lottery System are found in another appendix—this one entitled "Appendix X2." Appendix X2 raised the base allocation to 975 terminals and also raised the overall limits on terminals. Most tribes have a new overall limit of 3000 terminals. Three tribes—Tulalip, the Muckleshoot Tribe, and the Puyallup Tribe—have a higher overall limit of 4000 terminals. As under Appendix X, a tribe that seeks to acquire the right to operate terminals in addition to its base allocation may do so through a plan approved by a majority of eligible tribes. This terminal allocation plan is the only mechanism specified in Appendix X2 for a tribe to obtain rights in excess of its base allocation.

Both Appendices X and X2 contain a "most-favored tribe clause" that entitles Tulalip to different, more favorable terms under certain circumstances. The substantive portion of each clause is the same:

> [I]n the event the State agrees (or is required by law or a court ruling to agree) to permit an allocation of Player Terminals to a tribe which is greater, or is on terms which are more favorable, than as set forth herein, the Tribe shall be entitled to such greater Allocation or more favorable terms.

Appendix X § 12.5; Appendix X2 § 12.4.

At the time of the 2007 amendment, the State and the tribes involved in the collective negotiations also agreed to a moratorium on amendments. Specifically, Appendix X2

contains a moratorium on compact amendments before June 30, 2009, unless the amendment would involve a technical change or would be by mutual agreement. After June 30, 2009, the tribe may seek an amendment under four specific circumstances: (1) federal or state law is amended to authorize gambling devices that were previously not permitted, (2) a court interpreting Washington law permits use of a gambling device not previously permitted, (3) another tribe or entity is allowed to use a type or number of class III gambling devices that is materially different or greater in quantity per location than authorized by Appendix X2, or (4) another tribe offers higher maximum wagers or the extension of credit.

## III.    THE SPOKANE COMPACT

The Spokane Tribe is one of two Washington tribes that did not participate in the collective negotiation process that led to the Tulalip Compact. In 2005, the Spokane Tribe and the State arrived at terms of an initial proposed compact, but the proposal was returned for further negotiations that proceeded concurrently with the collective negotiation of the terms of Appendix X2 to the Tulalip Compact, discussed above. The Spokane Tribe and the State eventually executed a compact (the "Spokane Compact") that became effective on April 30, 2007. *See* Notice of Amendment to Approved Tribal–State Compact, 72 Fed. Reg. 21,284-03 (Apr. 30, 2007).

The Spokane Compact also includes multiple appendices. The three at issue here are "Spokane Appendix X," "Appendix Spokane," and "Spokane Appendix X2." Spokane Appendix X, which mirrors part of the Tulalip Compact,

authorizes operation of lottery games similar to those described in Tulalip's Appendix X.

Appendix Spokane, in turn, sets a base allocation of the right to operate 900 player terminals and an overall limit of 4700 terminals. Appendix Spokane permits the Spokane Tribe to acquire additional terminal allocation rights over the base allocation from other authorized Washington tribes. It departs, however, from the terms of the Tulalip Compact by establishing the Inter-Tribal Fund as an alternative way to acquire terminal allocation rights. This option was intended to address, in part, the fact that few terminal licenses were available to be leased under the Tribal Lottery System.

To acquire rights via the Inter-Tribal Fund, the Spokane Tribe would pay into a fund that would be distributed among eligible tribes. This mechanism would be available only if certain conditions were met: the Spokane Tribe must make and report reasonable efforts to obtain rights from other tribes and must commit to negotiating a revised statewide tribal gaming framework after three years. Using the Inter-Tribal Fund would also trigger limits—the Spokane Tribe's overall terminal limit would decrease from 4700 to 3000 during renegotiation.

About 18 months after the Spokane Compact took effect, the State and the Spokane Tribe agreed to another amendment, the terms of which are contained in Spokane Appendix X2. Like Appendix X2 to the Tulalip Compact, Spokane Appendix X2 raises the base terminal allocation and allows the tribe to increase the number of terminals that it is entitled to operate by way of a terminal allocation plan, so long as the plan has been approved by a majority of eligible tribes. Spokane Appendix X2 also conditions the Spokane

Tribe's right to lease terminals to other tribes upon its decision not to invoke the Inter-Tribal Fund. Use of the Inter-Tribal Fund by the Spokane Tribe would terminate any terminal allocation transfer agreements executed by the tribe pursuant to the terminal allocation plan. The Spokane Appendix X2 amendment became effective on October 24, 2008. *See* Notice of Approved Tribal–State Gaming Compact Amendment, 73 Fed. Reg. 63,503-02 (Oct. 24, 2008).

## IV.    THIS DISPUTE

Tulalip requested negotiations with the State to amend its compact in 2010. Citing the most-favored tribe clause, Tulalip wanted to amend its compact to include a mechanism similar to the Inter-Tribal Fund set forth in Appendix Spokane. The State disagreed with Tulalip's interpretation of both the most-favored tribe clause and Appendix Spokane. During negotiations, the State expressed concern that the Tribe's proposed amendments did not incorporate the conditions and limitations contained in Appendix Spokane. Negotiations continued into 2012, ending when the Tribe did not respond to the State's counterproposal to negotiate an appendix with an Inter-Tribal Fund, provided that the amendment included limitations similar to those contained in Appendix Spokane.

After negotiations broke down, in April 2012, Tulalip initiated suit in the district court, seeking "a declaration that the State is in breach of the Compact and an injunction requiring the State to comply with the Compact." The Tribe asserted that the most-favored tribe clause in the Tulalip Compact entitled it to an Inter-Tribal Fund mechanism. Framing the mechanism as an "alternative viable method"

available to the Spokane Tribe but unavailable to Tulalip—and thus a more favorable term—Tulalip demanded that the State be forced to execute the proposed compact amendment. Tulalip's proposed amendment does not include the conditions or limitations that would have been triggered by using the Inter-Tribal Fund set forth in Appendix Spokane.

The Tribe moved for summary judgment. The State responded with a cross-motion for summary judgment and motion to dismiss for failure to join other tribes pursuant to Federal Rule of Civil Procedure 19. In a single order, the district court decided all of the motions and granted summary judgment to the State.

The court noted that Appendix Spokane became effective before Appendix X2, perhaps suggesting that the most-favored tribe clause in Appendix X2 could not be used to obtain terms found in Appendix Spokane. The court went on to reason that even if the clause applied, Tulalip's argument failed on its merits. On appeal, Tulalip argues both that the court failed to separately consider its motion for summary judgment and that the court erred by entering judgment for the State.

## ANALYSIS

### I. CONSIDERATION OF THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

We first consider Tulalip's argument that reversal is warranted because the district court failed to separately consider Tulalip's motion for summary judgment. "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the

appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

We are perplexed by Tulalip's challenge because the district court did exactly what was required by *Fair Housing Council*. The court separately reviewed and decided Tulalip's motion. The court summarized Tulalip's arguments, cited authority referenced by Tulalip, and cited exhibits to a declaration submitted by Tulalip. It is not surprising that the court did not organize its discussion of the cross-motions into separate sections: briefing on the motions was combined in response to an agreed upon motion by the parties and the central legal issue was the same. We have no concern, as we did in *Fair Housing Council*, that a procedural technicality rendered the losing motion moot. We are satisfied that the court "rule[d] on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998).

## II.  INTERPRETATION OF THE COMPACTS

Tulalip's success here hinges on what is guaranteed by the most-favored tribe clause, which states that "in the event the State agrees . . . to permit an allocation of Player Terminals to a tribe which is . . . on terms which are more favorable, than as set forth herein, the Tribe shall be entitled to such . . . more favorable terms." Appendix X § 12.5;

Appendix X2 § 12.4.[1]  Tulalip's effort to benefit from this clause is unsuccessful because its proposed terms do not even track the terms of the Spokane Compact.

Our departure point is whether this clause applies in relation to the Spokane Compact terms that Tulalip claims are "more favorable."  Tulalip seeks what it calls the "combined" terminal allocation plan and Inter-Tribal Fund procedures authorized in the Spokane Compact.  Although the initial Spokane Compact took effect in April 2007, the last amendment to it became effective on October 24, 2008— more than a year after Appendix X2 to the Tulalip Compact took effect on May 31, 2007.  In light of this timing, we give Tulalip the benefit of the doubt and assume that the Spokane Compact as it was last amended is an acceptable reference point for potentially more favorable terms.  Thus, we do not adopt the district court's suggestion that the timing of the two compacts deprives Tulalip of the benefit of the most-favored tribe clause.

We next consider the two compacts, which begin on similar ground.  Appendix X2 and Spokane Appendix X2 entitle Tulalip and the Spokane Tribe, respectively, to the same base allocation of terminals and the right to acquire additional terminal allocation rights from other eligible tribes

---

[1] We agree with the parties that Washington contract law, which comports with federal common law, governs the interpretation of the compacts.  *See Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095, 1098 (9th Cir. 2006) (noting that IGRA compacts are governed by federal common law and accepting state law where there is no material difference).  Under Washington law, we "attempt to determine the parties' intent by focusing on the objective manifestations of the agreement . . . ." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005).

via bilateral negotiations pursuant to a terminal allocation plan.

Should these negotiations fail, however, the compacts diverge as to the available options. The Tulalip Compact provides no alternative mechanism by which Tulalip may obtain more terminal rights if negotiations under the terminal allocation plan fail. The Spokane Compact offers, by contrast, an alternative mechanism to obtain more terminal rights: the Inter-Tribal Fund. Section 6 of Appendix Spokane provides that if the Spokane Tribe is unable to acquire allocation rights for terminals in excess of its base allotment "after making reasonable efforts to do so," it may obtain such rights by paying into the Inter-Tribal Fund. Section 7 then sets forth the mechanics of the Inter-Tribal Fund.

Like Appendix Spokane, Tulalip's proposed amendment would authorize Tulalip to use an Inter-Tribal Fund. The trigger for using the Inter-Tribal Fund would be similar to part of Section 6 of Appendix Spokane: if Tulalip is unable to acquire allocation rights for terminals in excess of its base allotment "after making reasonable efforts," it would be permitted to pay into the Inter-Tribal Fund. The Inter-Tribal Fund would work essentially as described in Section 7 of Appendix Spokane.

What distinguishes Tulalip's proposed amendment and Appendix Spokane are the consequences of using the Inter-Tribal Fund. Unlike Appendix Spokane, Tulalip's proposed use of the Inter-Tribal Fund would not require it to accept a lower overall ceiling on the permitted number of terminals. Section 6 of Appendix Spokane, by contrast, establishes clear consequences for using the Fund—a lower overall limit on terminals (initially, using the Fund would lower the ceiling on

the Spokane Tribe to 3000 from 4700). Nor would Tulalip's proposed amendment require the tribe to participate in renegotiating a revised statewide tribal gaming framework, as does Appendix Spokane. Finally, Tulalip's proposal leaves out other consequences contained in Spokane Appendix X2—namely, that the right to lease terminals to other tribes is dependent on *not* using the Inter-Tribal Fund and that any use of the Inter-Tribal Fund would terminate any agreements executed pursuant to a terminal allocation plan.

In these differences lies the heart of this dispute. The district court was correct that Tulalip is "cherry-picking" the terms of its proposed amendment and that the State "never agreed to the allocation terms [Tulalip] seeks." Because Tulalip would have us impose some, but not all, of the interdependent "terms" that govern the Inter-Tribal Fund in the Spokane Compact, the proposed amendment can hardly be described as reflecting "such" "more favorable terms" to which the State has "agreed"—to echo the language of the most-favored tribe clause. Tulalip's proposed amendment is a *sui generis* package of terms; the State has not agreed to them at all. We thus need not reach the question of whether the terms of the Spokane Compact are actually "more favorable."

Tulalip is mistaken that it only seeks the terms of Section 7 of Appendix Spokane and that these terms are divisible from the rest of Appendix Spokane. The plain text of Tulalip's proposed amendment acknowledges the importance of Section 6 of Appendix Spokane. Mirroring Section 6.A, the proposed amendment establishes that the tribe would only be eligible to use the Inter-Tribal Fund "after making reasonable efforts" to use the terminal allocation plan. The interdependency between these provisions

undermines Tulalip's position that the "more favorable" terms are contained entirely within Section 7.

Our prior gaming compact case involving a most-favored tribe clause, *Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095 (9th Cir. 2006), does not dictate a different result. The provision in *Shoshone-Bannock Tribes* stated, "In the event any other Indian tribe is permitted by compact or final court decision to conduct any Class III games in Idaho in addition to those games permitted by this Compact, this Compact shall be amended to permit the Tribes to conduct those same additional games." *Id.* at 1098. The plaintiff tribes sought an amendment to get the "one thing" guaranteed by that provision: "the operation of the same games conducted by other tribes under their compacts." *Id.* at 1099. They pointed to a state statute that allowed tribes "to conduct gaming using tribal video gaming machines pursuant to state–tribal gaming compacts which specifically permit their use." Idaho Code § 67-429B(1). Citing three tribes that had amended their compacts to allow for the operation of video gaming machines, they simply wanted the same thing. Our inquiry thus centered on the comparatively simple question: were the tribes entitled to operate those games? Our answer was yes.

Tulalip points to the fact that we simultaneously rejected the argument that the tribes should be required to accept limitations on the number of gaming terminals that were also included in those other tribes' compacts. *Shoshone-Bannock Tribes*, 465 F.3d at 1100. Our reasoning on that point was grounded in the language of the most-favored tribe clause in the compact: "[t]he plain meaning of 'same additional games' refers to the games themselves and not the number of machines." *Id.*

The question before us here is different.  We are addressing a much broader phrase—the Tulalip Compact's promise of such "terms which are more favorable."  Given the interdependent, conditional nature of the terms that govern the Spokane Compact's Inter-Tribal Fund mechanism, Tulalip does not get beyond the threshold question of whether the State agreed to the terms in its proposed amendment. They are not equivalent to the terms of Appendix Spokane.

Our conclusion is consonant with our instruction in *Shoshone-Bannock Tribes* that courts should hold compacting parties to the ordinary meaning of terms in their agreements. *Id.* at 1098–100.  The plain language of the Spokane Compact shows that the Inter-Tribal Fund mechanism available to the Spokane Tribe carries with it interdependent conditions and consequences.  Tulalip's amendment would not match those terms.  We take no view on whether the terms of Appendix Spokane are in fact more favorable than those included in the Tulalip Compact.  We hold simply that Tulalip is not entitled as a matter of law to the more selective set of terms in its proposed amendment.[2]  The most-favored tribe clause does not allow a "pick and choose" arrangement.  The district court correctly entered judgment for the State.  Simply put, Tulalip's proposal does not mirror the restrictions of Appendix Spokane, and those are the terms to which the State agreed.

**AFFIRMED.**

---

[2] Because we affirm the district court on this ground, it is unnecessary to reach the other issues presented in this appeal.